1
2
3
4
5
6
7

United States District Court
Northern District of California

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

SEAN NUGENT,

            Plaintiff,

    v.

SECRETLAB US, INC.,

            Defendant.

Case No. 22-cv-08944-RFL   (PHK)

**ORDER GRANTING PLAINTIFF SEAN NUGENT'S REQUEST TO COMPEL DISCOVERY AND DENYING DEFENDANT SECRETLAB US'S REQUEST TO COMPEL DISCOVERY**

Re: Dkts. 39, 48, 71

Now before the Court is a Joint Discovery Dispute between Plaintiff Sean Nugent and Defendant Secretlab US, Inc.'s ("Secretlab US").  [Dkt. 39].  Plaintiff Nugent seeks to compel Secretlab US to produce certain documents which are purportedly in the possession, custody, and/or control of third-party Secretlab SG Pte. Ltd.  ("Secretlab SG"), which is the corporate parent of Secretlab US.  [Dkt. 39].  For its part, Secretlab US seeks to compel the production of Plaintiff Nugent's retainer agreement with his counsel.  After carefully reviewing the initial Joint Discovery Letter, the supplemental Joint Discovery Letters, and after oral argument and an evidentiary hearing, the Court **GRANTS** Plaintiff Nugent's motion to compel Secretlab US to produce certain documents from the files of third-party Secretlab SG, because as discussed herein the Court finds that Secretlab US has control over those documents, and the Court **DENIES** Secretlab US's motion to compel production of Plaintiff Nugent's retainer agreement.

# BACKGROUND

## I.  FACTUAL BACKGROUND

Secretlab US markets and sells furniture, including in particular desk chairs marketed for persons playing computer or video games (so-called "gaming chairs").  On December 19, 2022, Plaintiff Sean Nugent, filed a putative class action complaint against Secretlab US, alleging violations of California's Consumers Legal Remedies Act, California's False Advertising Law, California's Unfair Competition Law, and Fraud under the Common Law with regard to certain chairs that Defendant markets and sells.  [Dkt. 1].

Secretlab US is a company in the business of marketing, selling, and distributing Secretlab Gaming Chairs.  *Id.* at 5.  Secretlab US is the wholly owned subsidiary of third-party Secretlab SG (which is based in Singapore, hence the "SG" moniker).  [Dkt. 39 at 4].  On February 13, 2024, the Parties submitted a Joint Discovery Letter Brief regarding two main discovery disputes.  [Dkt. 39]. Plaintiff Nugent requests a court order compelling Secretlab US to produce certain documents sought by certain requests for production (RFPs) and interrogatories (ROGs).  *Id.*  The RFPs and ROGs center around "requesting pricing history, sales data, and other documents and information regarding the sale and advertisement of the challenged products" in the dispute.  *Id.* at 1.

Contemporaneously, Secretlab US requests a court order compelling Plaintiff Nugent to produce its retainer agreement.

The Court held a hearing on these discovery disputes and ordered the parties to submit supplemental briefing on issues raised at the hearing.  [Dkt. 46].  After the Parties submitted the supplement briefing, the Court set an evidentiary hearing in order to obtain a more complete factual record on the issue of "control" of documents as between the two Secretlab corporate entities.  [Dkt. 53].  After the evidentiary hearing, the Parties requested the opportunity to submit further letter briefs, which was granted.  On June 3, 2024, the Parties submitted their final round of letter briefs. [Dkt. 71].

For the following reasons, Plaintiff Nugent's motion to compel is **GRANTED** and Secretlab US's motion to compel is **DENIED**.

**II.     FINDINGS OF FACT**

The Court finds the following relevant facts for this matter, based on the materials submitted and the testimony of the one witness who testified at the evidentiary hearing, specifically Welly Tantono, the General Counsel and Corporate Secretary for all Secretlab corporate entities worldwide, who testified as a representative of Secretlab US. *Id.* at 4; Dkt. 69 at 5, 6, 11–12, 39, 67 (Hearing Transcript).

Secretlab SG owns all the shares of Secretlab US. [Dkt. 69 at 10 ("Secretlab SG Pte. Ltd. owns 100 percent of the shares of Secretlab US, Inc.")]. Secretlab SG and Secretlab US are separate entities for adherence to tax structures. *Id.* at 19–22, 28–29, 32, 34, 37, 101. Specifically, segregation of companies is crucial so that the Secretlab entities are not overtaxed or taxed for the same transaction in multiple jurisdictions. *Id.* at 101.

Ian Ang (the founder of Secretlab) is Director and CEO for both Secretlab US and Secretlab SG. *Id.* at 11–12, 48, 50. Mr. Ang's role includes "sign[ing] off on documents on behalf of Secretlab US." *Id.* at 48. Alaric Choo is a Director and the Chief Strategy Officer of both Secretlab US and Secretlab SG. *Id.* at 11–12, 48, 50. Mr. Choo's role for Secretlab US includes "sign[ing] of on director resolutions that requires him to sign off on." *Id.* at 48.

The Secretary of State for the State of California issued a "Statement and Designation by Foreign Corporation" certificate to Secretlab US on April 23, 2018. *Id.* at 97. That Statement, issued by the California Secretary of State, indicates that Secretlab US's principal executive office location is in Singapore. *Id.* That Statement bears the signature of the CEO of Secretlab (both the US and SG entities), Mr. Ang. *Id.*

Secretlab US is a distributor in the United States for the goods produced by Secretlab SG. *Id.* at 14, 16, 80. The two principal roles of Secretlab US are (1) "to enter into buy-sell transactions with consumers in the United States" and (2) "enter into relationships with fulfillment service providers." *Id.* at 14. However, Secretlab US does ***not*** have any employees in the United States. *Id.* at 12, 18, 41–42, 44, 50, 70, 73, 84, 85.

Secretlab uses third parties to conduct the steps required to sell and then deliver products to consumers in the US. Sales transactions for Secretlab's goods with end-users and consumers are

3

automatically facilitated through third-party Shopify. *Id*. at 14, 16, 80. Shopify runs the Secretlab website and facilitates all Secretlab US buy-sell transactions. *Id*. at 80. Distribution and fulfillment/delivery of goods to consumers are handled by third-party warehousing and fulfillment service providers. Secretlab SG employees identify those warehouses with which Secretlab US should contract for product warehousing and distribution. *Id*. at 42. Secretlab SG employees are involved in the fulfilment of Secretlab US customers' rerouted shipment (or address change) requests. *Id*. at 89.

Secretlab US is a significant financial contributor to Secretlab SG. *Id*. at 53, 54, 57. Indeed, "the bulk of the sales for the entire group company occurs in the United States." *Id*. at 57. Secretlab's witness admitted that "a portion" of Secretlab US's revenue reverts back to Secretlab SG. *Id*. at 54. Secretlab US has acted as a financial guarantor for a Secretlab group trade facility, at the request of a bank. *Id*. at 52–54, 59–60. Secretlab US was the guarantor in this instance because the trade facility was obtained for the benefit of or on behalf of all Secretlab entities. *Id*. at 59–60.

Business operations for the parent (Secretlab SG) and its subsidiary (Secretlab US) are centralized in Singapore. *Id*. at 62, 69–70. Secretlab US uses Secretlab SG employees for any Secretlab US work functions which are not related to product distribution. *Id*. at 15, 42, 61, 62–63, 89. Specifically, California-based customers communicate with either Secretlab SG employees or Secretlab SG's service providers when interacting with online Secretlab US store chat bots. *Id*. at 15.

Secretlab US and Secretlab SG have the same legal team. *Id*. 39–40, 42–43, 47, 69, 79. Tantono averred that there is "a single legal team that represents all of [their] legal entities" at both the parent and subsidiary level. *Id*. at 39. When one of the subsidiaries, like Secretlab US, needs to create a contract, it is sent to the centralized legal team. *Id*. at 42–43. Thus, Secretlab SG's Singapore-based legal team prepared Secretlab US's litigation documents for the hearing in this matter. *Id*. at 61. As the General Counsel and Secretary of Secretlab US, Tantono "ensur[es] Secretlab US is in compliance with the laws and regulations it needs to comply with." *Id*. at 48. As such, Tantono supports contracts and dispute resolution on an as-needed basis. *Id*. Tantono's

4

income comes from Secretlab US's parent company, Secretlab SG.  *Id*. at 59.

There is a centralized website domain for the entire Secretlab group, which was purchased for the use of all Secretlab entities and is under Secretlab SG's control.  *Id*. at 14–15, 61–62, 64, 78–79.  Specifically, all Secretlab group corporations use the Secretlab SG-controlled domain, "secretlab.co."  *Id*. at 14.  The Secretlab domain was initially purchased by the founder of the company, Mr. Ang, and transferred to Secretlab SG's control in 2019.  *Id*. at 61–62.  Every employee e-mail address uses the domain "secretlab.sg;" there is no US-designated email address.  *Id*. at 78–79.

The documents and files of both Secretlab US and Secretlab SG are held in a common centralized repository.  *Id*. at 32, 46, 76–77, 79, 101–102.  "[D]ocuments that belong to Secretlab SG Pte. Ltd. and documents that belong to the US subsidiary, are often stored within the same repository."  *Id*. at 101–102.  All Secretlab employees have technical access to the centralized repository which stores files from Secretlab US and Secretlab SG.  *Id*. at 31–32, 44–47, 101–102.  All Secretlab records are digitized and hosted or stored in a cloud computing system, which means all employees have technical access to all documents worldwide (given the nature of cloud computing).  *Id*. at 31.  In order for a Secretlab employee to log into the Secretlab SG computer system as opposed to the Secretlab US system (and thus access documents), that an employee does not "have to do an additional step of verification."  *Id*. at 46.  More specifically, when accessing files stored on the Secretlab centralized repository, the witness Tantono confirmed that there is no distinction between herself when she is working on behalf of Secretlab US as opposed to when she is working on behalf of Secretlab SG.  *Id*. at 46.  Tantono confirmed that Secretlab SG employees obtain Secretlab US documents when requested by Tantono.  *Id*. at 62–63.

## LEGAL STANDARD

### I.    POSSESSION, CUSTODY, OR CONTROL OF DOCUMENTS

A party served requests for production must produce responsive, non-privileged materials within its "possession, custody, or control" (assuming the scope of discovery is relevant and proportional to the needs of the case).  *See* Fed. R. Civ. P. 34(a).  The phrase "'possession, custody, or control' is in the disjunctive and only one of the numerated requirements need be met."  *Soto v.*

1   *City of Concord*, 162 F.R.D. 603, 619 (N.D. Cal. 1995) (citation omitted).

2       With regard to "possession" of a document, courts typically refer to a party's "actual

3   possession" or "physical possession" (or even "actual physical possession").  *See, e.g.*, *In re Bankers*

4   *Trust Co.*, 61 F.3d 465, 469 (6th Cir. 1995) ("federal courts have consistently held that documents

5   are deemed to be within the 'possession, custody or control' for purposes of Rule 34 if the party has

6   *actual* possession, custody or control") (emphasis in original); *Great Northern Ins. Co. v. Altmans*

7   *Prods. LLC*, 2009 WL 10680841, at *1 (E.D. Mich. Mar. 16, 2009) ("The duty to produce is not

8   limited to those items in Plaintiff's physical possession."); *A.V.E.L.A., Inc. v. Estate of Monroe*,

9   2014 WL 1408488, at *4 n.2 (S.D.N.Y. Apr. 11, 2014) ("a party may be required to produce

10  discovery under Rule 34 not only where it has actual physical possession of the documents at

11  issue[.]").  "[I]t has been noted that the rule, which requires a person to turn over responsive

12  documents in his 'possession, custody, or control,' is 'broadly construed to encompass both actual

13  and constructive possession.'"  *In re Wells*, 426 B.R. 579, 610 (B'y N.D. Tex. May 4, 2006) (quoting

14  *Thomas v. Deloitte Consulting LP*, 2004 WL 1372954, at *4 (N.D. Tex. June 14, 2004) (construing

15  same phrase in Fed. R. Civ. P. 45)).  Further, "[a] party having actual possession of documents must

16  allow discovery even if the documents belong to someone else; legal ownership of the documents

17  is not determinative."  *Stone v. Vasquez*, 2009 WL 2581338, at *1 (E.D. Cal. Aug. 20, 2009).

18      Similarly, with regard to "custody" of documents, courts typically refer to "actual custody"

19  or "physical custody" of materials which are required to be produced in response to discovery

20  requests.  *See Redon v. Ruiz*, 2015 WL 13229500, at *11 (S.D. Cal. Dec. 4, 2015) ("Even if plaintiff

21  does not have actual custody or possession of his medical and mental health records[.]").

22      Under Rule 34, the scope of possession, custody, and control is construed broadly.  *Akbar v.*

23  *Bangash*, 2018 WL 11351991, at *4 (E.D. Mich. Aug. 16, 2018).  Yet, "[c]ontrol must be firmly

24  placed in reality . . . not in an esoteric concept such as in an 'inherent relationship.'"  *United States*

25  *v. Int'l Union of Petroleum and Indus. Workers, AFL-CIO*, 870 F.2d 1450, 1453 (9th Cir. 1989).

26  "Documents not actually possessed by the [requested] party may be considered within its control if

27  the party has 'the legal right to obtain the documents on demand.'"  *Micron Tech., Inc. v. Tessera,*

28  *Inc.*, No. 06-mc-80096-JW (HRL), 2006 WL 1646133, at *1 (N.D. Cal. June 14, 2006) (quoting *In*

United States District Court
Northern District of California

1    re Citric Acid Litig., 191 F.3d 1090, 1107 (9th Cir. 1999) [hereinafter Citric Acid]).  The Ninth

2    Circuit has not specifically defined what constitutes a "legal right" to obtain the documents.

3    Tessera, Inc. v. Micron Tech., Inc., No. 06-mc-80024-JW (PVT), 2006 WL 733498, at *4 (N.D.

4    Cal. Mar. 22, 2006).  While a "[l]egal right suggests an ownership interest, a binding contract, a

5    fiduciary duty, or some other legally enforceable arrangement[,]" Micron Tech., 2006 WL 1646133,

6    at *1, courts engage in a factual and case specific inquiry to make the determination, Tessera, Inc.,

7    2006 WL 733498, at *4; accord Cryptography Rsch., Inc. v. Visa Int'l Serv. Ass'n, No. 04-cv-04143-

8    JW (HRL), 2005 WL 8162416, at *1–2 (N.D. Cal. Aug. 4, 2005).

9        In determining whether one corporate entity has "control" for purposes of discovery over

10   another entity, courts look to the following factors: (1) whether the corporations have interlocking

11   corporate structure and management; (2) whether the corporations operate as a single unit in all

12   aspects of the relevant business; (3) whether the corporations have identical stockholders and

13   directors; (4) whether the subsidiary acted as the agent of the parent in the relevant transaction; (5)

14   whether the subsidiary can secure documents from the parent to meet its own business needs; (6)

15   whether the subsidiary has some ownership interest in the parent; (7) and other factual inquiries that

16   are case specific.  Cryptography Rsch., 2005 WL 8162416, at *1–2; see Citric Acid, 191 F.3d 1090;

17   United States v. Int'l Union of Petroleum & Indus. Workers, AFL-CIO, 870 F.2d 1450, 1452 (9th

18   Cir. 1989).

19       "Legal ownership of the requested documents or things is not determinative, nor is actual

20   possession necessary if the party has control of the items.  Control has been defined to include 'the

21   legal right to obtain the documents requested upon demand.'  The term 'control' is broadly

22   construed."  These principles have been applied in a wide variety of situations. Parent corporations

23   have been compelled to produce documents in the hands of subsidiaries, subsidiaries documents in

24   the hands of their parent entities, corporation's documents in the hands of employees, clients

25   documents in the hands of attorneys, corporate officers and directors documents in the hands of their

26   corporations, and patients documents in the hands of health care providers."  Simon v. Taylor, 014

27   WL 6633917 at *32–33 (D. N.M. Nov. 18, 2014) (internal quotations omitted).  A party seeking

28   production of documents bears the burden of establishing the opposing party's control over those

United States District Court
Northern District of California

7

1    documents.  *Int'l Union*, 870 F.2d at 1452.

2    **II.    LEGAL STANDARD FOR REVIEW OF LAW FIRM RETAINER AGREEMENTS**

3         Under the familiar standards of the Federal Rules of Civil Procedure, parties may obtain

4    discovery regarding any "nonprivileged matter" that is "relevant to any party's claim or defense and

5    proportional to the needs of the case, considering the importance of the issues at stake in the action,

6    the amount in controversy, the parties' relative access to relevant information, the parties' resources,

7    the importance of the discovery in resolving the issues, and whether the burden or expense of the

8    proposed discovery outweighs its likely benefit."    Fed. R. Civ. P. 26(b)(1). "Discovery of

9    nonprivileged information not admissible in evidence remains available so long as it is otherwise

10   within the scope of discovery." Fed. R. Civ. P. 26, advisory committee's notes to 2015 amendment.

11   *Jones v. Sunbelt Rentals, Inc.*, No. 22CV05954AMOPHK, 2023 WL 6215295, at *3 (N.D. Cal.

12   Sept. 22, 2023).

13        The scope of relevant discovery under Rule 26(b) is tied to the claims and defenses asserted

14   in the case, balanced against proportionality. *See In re Williams-Sonoma, Inc.*, 947 F.3d 535, 539

15   (9th Cir. 2020) (after 2015 amendment to Rule 26(b)(1), "the matter sought must be 'relevant to any

16   party's claim or defense.' Rule 26(b)(1). That change, however, was intended to restrict, not

17   broaden, the scope of discovery.  *See* Rule 26(b)(1), advisory committee's notes to 2000

18   amendment; *see* [Rule 26(b)(1),] advisory committee's notes to 2015 amendment[.]").

19        This case is a putative class action, at the pre-certification stage.  "Generally at the pre-class

20   certification stage, discovery in a putative class action is limited to certification issues such as the

21   number of class members, the existence of common questions, typicality of claims, and the

22   representative's ability to represent the class."  *Gusman v. Comcast Corp.*, 298 F.R.D. 592, 595

23   (S.D. Cal. 2014) (citing *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 359).  "Generally, class

24   representative engagement letters are not relevant unless the defendants can substantiate the

25   existence of a conflict, beyond mere speculation."  *Flodin v. Central Garden & Pet Co.*, 2024 WL

26   3859803, at *1 (N.D. Cal. Aug. 16, 2024).

27         In the context of class actions, "incentive awards are payments to class representatives for

28   their service to the class in bringing the lawsuit.  In cases where the class receives a monetary

United States District Court
Northern District of California

8

settlement, the awards are often taken from the class's recovery." *Radcliffe v. Experian Info. Solutions Inc.*, 715 F.3d 1157, 1163 (9th Cir. 2013) (citation omitted). "[N]amed plaintiffs, as opposed to designated class members who are not named plaintiffs, are eligible for reasonable incentive payments." *Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003). Service awards for named plaintiffs "are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputation risk undertaken in bringing the action, and, sometimes to recognize their willingness to act as a private attorney general." *Foster v. Adams and Assocs., Inc.*, 2021 WL 4924849, at *5 (N.D. Cal. Oct. 21, 2021).

Incentive awards are distinguished from incentive agreements. The specific discovery issue here relates to whether or not the named plaintiffs' engagement letter with counsel contains incentive agreements for the named plaintiffs. As the Ninth Circuit has explained:

> Incentive *awards* are fairly typical in class action cases. See 4 William B. Rubenstein et al., *Newberg on Class Actions* § 11:38 (4th ed.2008); Theodore Eisenberg & Geoffrey P. Miller, *Incentive Awards to Class Action Plaintiffs: An Empirical Study*, 53 U.C.L.A. L.Rev. 1303 (2006) (finding twenty-eight percent of settled class actions between 1993 and 2002 included an incentive award to class representatives). Such awards are discretionary, and are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general. Awards are generally sought after a settlement or verdict has been achieved.
>
> The incentive *agreements* entered into as part of the initial retention of counsel in this case, however, are quite different. Although they only bound counsel to apply for an award, thus leaving the decision whether actually to make one to the district judge, these agreements tied the promised request to the ultimate recovery and in so doing, put class counsel and the contracting class representatives into a conflict position from day one.

*Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009) (emphasis in original) (citations omitted).

In *Rodriguez*, the Ninth Circuit explained the relevance of incentive awards as follows:

> The [incentive award] arrangement was not disclosed when it should have been and where it was plainly relevant, at the class certification stage. Had it been, the district court would certainly have considered its effect in determining whether the conflicted plaintiffs . . . could adequately represent the class. The conflict might have been

United States District Court
Northern District of California

United States District Court
Northern District of California

> waived, or otherwise contained, but the point is that uncovering conflicts of interest between the named parties and the class they seek to represent is a critical purpose of the adequacy inquiry. "[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." An absence of material conflicts of interest between the named plaintiffs and their counsel with other class members is central to adequacy and, in turn, to due process for absent members of the class.

*Id.* at 959 (citations omitted).

Thus, if a defendant makes an adequate showing to justify discovery into an engagement agreement, discovery may be appropriate to determine the existence of an incentive agreement in a law firm's engagement agreement with the named plaintiffs. *In re Google AdWords Litig.*, No. C08-03369 JW HRL, 2010 WL 4942516, at *4 (N.D. Cal. Nov. 12, 2010) (citing *Rodriguez*, 563 F.3d at 959-60). However, mere speculation or a desire to "have an opportunity to check and see if there was a *Rodriguez*-type situation" in an engagement agreement is insufficient to warrant discovery. *Id.* at *5 (denying motion to compel production of engagement agreement). Thus, simply because there exists a hypothetical risk that an engagement letter might contain an incentive agreement does not "stand for the broad proposition that the fee arrangements between named plaintiffs and plaintiffs' counsel should be discoverable without any reason to think there is a potential conflict." *Id.* at *4.

# DISCUSSION

## I.    POSSESSION, CUSTODY, AND CONTROL

### A.    Whether Secretlab US has possession and custody of Secretlab SG documents

While the parties dispute the issue, the Court held an extensive evidentiary hearing in order to determine how Secretlab US and Secretlab SG maintain their documents. The witness, who is a lawyer and General Counsel for both Secretlab US and Secretlab SG, testified on behalf of both entities and the Court finds that Ms. Tantono has personal knowledge of the document storage and procedures for document access for both companies. In sum, the Court finds that Secretlab US has actual possession and custody of the relevant documents of Secretlab SG.

Stepping back, Secretlab US has no employees, only a handful of corporate officers and board members. All work for Secretlab US is handled either by Secretlab SG or by third party

United States District Court
Northern District of California

1    contractors for online sales, warehousing, and delivery.   Secretlab SG employees, based in

2    Singapore, identify the warehousing contractors for Secretlab US.   Secretlab SG's legal department

3    provides all legal services for Secretlab US.   The officers and directors of Secretlab US are also, at

4    the same time, officers and directors of Secretlab SG.   The reality of the situation here impacts the

5    Court's findings.

6        All documents for the business of both Secretlab US and Secretlab SG are stored on the same

7    computer server.   [Dkt. 69 at 32, 46, 76–77, 79, 101–102].   This server is accessible at all times by

8    both Secretlab US and Secretlab SG personnel, from anywhere in the world (because it is a cloud-

9    based system).   *Id.* at 31–32, 44–47, 101–102.   This arrangement demonstrates that Secretlab US

10   has continuous and unfettered access to the documents of both Secretlab SG and Secretlab US.

11   Under appropriate legal standards and in view of the reality of the computer system used here,

12   Secretlab US has actual possession and custody of the documents of Secretlab SG.   *PlayUp, Inc. v.*

13   *Mintas*, No. 2:21-CV-02129-GMN-NJK, 2024 WL 3621449, at *3 (D. Nev. Aug. 1, 2024) ("a

14   finding of actual possession is alone sufficient to trigger an obligation to produce responsive

15   documents"); *Thomas v. Hickman*, No. 106-CV-00215-AWI-SMS, 2007 WL 4302974, at *13 (E.D.

16   Cal. Dec. 6, 2007) ("A party having actual possession of documents must allow discovery even if

17   the documents belong to someone else; legal ownership of the documents is not determinative.").

18       The Court is persuaded by the fact that, when a Secretlab US personnel logs onto this

19   centralized, computer repository for documents, there is no separate procedure and there is no

20   separate credentialing required for that same Secretlab US personnel to access any Secretlab SG

21   documents.   Fundamentally, there are no technical limitations to what a Secretlab US individual can

22   access on the server.   [Dkt. 69 at 31].   Indeed, because all Secretlab US personnel are,

23   simultaneously, Secretlab SG personnel, it is somewhat formalistic to refer to "Secretlab US

24   personnel" in this context, because the Secretlab worldwide computer system makes no such

25   distinction.   The record indicates that there are no distinct credentials or separate logins required for

26   accessing the documents of either corporate entity.   *Id.* at 46.   This absence of electronic firewall or

27   separate security measures signifies that any employee or representative of Secretlab US can access

28   the full range of documents of Secretlab SG at any given time without encountering any restrictions.

*Id.* This makes sense given the nature of Secretlab US's duties as a corporate entity and is certainly efficient for the Secretlab personnel (who are all based in Singapore) since it allows for seamless access to the documents of both businesses which are controlled and run from Singapore. The absence of individualized login credentials or compartmentalized access reinforces the conclusion that Secretlab US has actual possession and custody of the documents stored on the shared server of Secretlab SG.

In its briefing, Secretlab US's primary argument as to why it should be found not to have possession or custody of Secretlab SG's documents relies on the alleged separation of roles with itself and its parent corporation by the "apparent" roles delineated in the Distribution Agreement between the two entities, dkt. 39 at 5. However, the Distribution Agreement does not alter the conclusion here, because nothing in that Agreement imposes limitations on the way the Secretlab SG computer files are stored in the cloud and imposes no technological restrictions on how anyone from Secretlab US can freely access the Secretlab SG documents from that worldwide computerized repository of Secretlab SG's documents. That is, the alleged separation of business responsibilities between the two corporate entities, formalized in the Distribution Agreement, is not germane or even relevant to the fact that, in day-to-day operation, Secretlab US has actual possession and custody of the Secretlab SG documents because they are on the same server which personnel from both entities can freely access.

Secretlab US also relies heavily on Tantono's testimony that Secretlab US personnel do not have undefined "authorization" to access the documents of Secretlab SG (except in certain work-related situations), dkt. 69 at 31–32, 44–45, 102–103. Tantono's testimony that Secretlab US personnel are somehow lacking in formal "authority" to access the Secretlab SG documents at any point, for any reason, is of no moment because this purported lack of authority does not change the operational realities of how the Secretlab group of companies have chosen to organize and use one worldwide, centralized server for all the documents of all the Secretlab companies, including Secretlab US and Secretlab SG. *Id.* at 31–32, 44–47, 101–102. Regardless of whether Secretlab US personal are told they have "authorization" to access Secretlab SG documents, the fact remains that Secretlab US personnel (who, again it bears noting, are also simultaneously Secretlab SG

United States District Court
Northern District of California

personal) log onto the same computerized server from which they obtain the documents of both Secretlab US and Secretlab SG.  The Court will not blind itself to the realities here – simply because there is an assertion of the existence of some amorphous idea that Secretlab US personnel need "authority" to access Secretlab SG documents, the fact is that the Secretlab SG documents are stored on the same server accessible by both the parent and subsidiary.  *Id.*

This case is factually similar to the Northern District of California's decision in *Choice-Intersil Microsystems, Inc. v. Agere Systems, Inc.*, 223 F.R.D. 471 (N.D. Cal. 2004).  There, the plaintiff subpoenaed documents from Infineon NA (a U.S. entity), and sought an order requiring Infineon NA to produce documents from its corporate parent (overseas), Infineon AG.  *Id.* at 472.  In *Choice-Intersil*, the record established that Infineon NA was scheduled to be the distributor of the products at issue of Infineon AG, that Infineon NA is the wholly owned subsidiary of Infineon AG, and (most notably) "Infineon NA and Infineon AG share databases dealing with a variety of documents [and] records."  *Id.*  Based in part on the Court's finding that Infineon NA has "access" to the documents of Infineon AG, the Court granted the motion to compel the production of the requested documents from the overseas parent company.  *Id.* at 473 (quoting *Cooper v. British Aerospace*, 102 F.R.D. 918, 919–20 (S.D.N.Y. 1984) (it was "inconceivable that defendant would not have access to [the] documents and the ability to obtain them for its usual business.")).

The Court's conclusion here is buttressed by analogous cases involving shared physical storage facilities or warehouses for documents.  When multiple entities intermingle the storage of their physical files of documents (for example, such as at a warehouse used by co-defendants for storing documents), an officer/director of one of the named defendants (also named as an individual defendant) has possession, custody, and control of the documents at that warehouse.  *Fidelity Nat. Title Inc. Co. of N.Y. v. Intercounty Nat. Title Ins. Co.*, 2002 WL 1433584, at *5 (N.D. Ill. July 2, 2002).  Such intermingled storage of physical files is clearly analogous to the intermingled storage of electronic files, here.  *Cf. also Synposys, Inc. v. Ricoh Co.*, 2006 WL 1867529, at *2 (N.D. Cal. July 5, 2006) (ordering counsel for defendant Ricoh to search storage facility housing a third party's boxes of documents based, in part, on the fact that "Ricoh was able to secure a search of the storage facility by" an officer of that third party regarding an earlier search of that storage facility).

1

2

3

Accordingly, the Court finds that, as between Secretlab SG and Secretlab US, their shared cloud-server arrangement ensures that the subsidiary has actual possession and custody of the electronically stored documents time through continuous and unfettered access.

### B.    Legal control

As noted, Rule 34 is written in the disjunctive – a party shall produce responsive, nonprivileged documents in its "possession, *or* custody, *or* control." *Daedalus Prime LLC v. Mediatek USA Inc.*, 2024 WL 4220000, at * 7 (N.D. Cal. Sept. 16, 2024).  In addition to the issue of possession and custody discussed above, the Parties dispute whether Secretlab US has "control" for purposes of Rule 34 – that is, whether there exists a legal right to obtain documents from the non-party, parent company, Secretlab SG, on demand.  [Dkts. 39, 48, 71].  To ensure an adequate record, the Court held an evidentiary hearing in order to determine the facts which would (or would not) show what level of "control" under Rule 34 Secretlab US has over the documents of its parent company Secretlab SG.  [Dkt. 67].  As explained above, the determination of legal control, for the purposes of discovery, hinges on a multifactor test which is analyzed on a case-by-case basis.  The Court addresses each factor in turn.

#### 1.    Whether the corporations have interlocking corporate structure and management

Secretlab US and Secretlab SG have interlocking corporate structure and management.  As noted, Secretlab US has no employees, dkt. 69 at 12, 18, 41–42, 44, 50, 70, 73, 84, 85, and relies heavily on Secretlab SG employees for various work functions beyond distribution, *id*. at 15, 42, 61, 62–63, 89.  For instance, California-based customers often interact with Secretlab SG employees or service providers through the online chat bots of Secretlab US's online store.  *Id.* at 15.  Moreover, Secretlab SG employees are responsible for identifying appropriate warehouses for Secretlab US's distribution needs.  *Id*. at 42.  The legal team in Singapore also prepares litigation documents for Secretlab US, highlighting a significant level of operational dependency.  *Id*. at 61.  Furthermore, Secretlab SG employees handle requests for documents from Secretlab US and are involved in managing shipment reroutes or address changes for US customers.  *Id*. at 89.  Additionally, every employee email address uses the domain "secretlab.sg," with no designated US-specific email

addresses. *Id*. at 78–79. This centralization of digital infrastructure under Secretlab SG's control underscores the interlocking corporate structure and management between Secretlab US and Secretlab SG. Finally, as noted, the CEO of Secretlab SG is also the CEO of Secretlab US; the CSO of Secretlab SG is also an officer and director of Secretlab US; and the General Counsel of Secretlab SG is also the General Counsel and Secretary of Secretlab US. *Id*. at 48. Finally, the corporate filings for Secretlab US identify its primary offices as the offices of Secretlab SG in Singapore. *Id*. at 62, 69–70, 97.

The corporate relationships here go beyond mere is coordination, collaboration, or even integration of functions and personnel. This is clearly a situation where all of the personnel, officers, directors, operations, and computer systems for Secretlab US are not merely integrated into but are dominated by and subsumed within Secretlab SG. This tightly knit corporate structure spans across both entities, and the centralized control and operational setup for both companies reinforce the operational dependency and synergistic (almost symbiotic) coordination between the entities. Because Secretlab sells directly to consumers worldwide through online stores or Internet portals, from an organizational efficiency standpoint, it makes sense for the entities to have seamless integration in their corporate governance and management practices.

Even though Secretlab US is assigned distinct functions (and tax responsibilities), focused on Secretlab US's role as a distributor of products to U.S. consumers, those functions do not alter the larger interlocking corporate structure between the US and Singapore entities. As such, this factor leans strongly in favor of a finding of legal control of documents for purposes of discovery.

### 2. Whether the corporations operate as a single unit in all aspects of the relevant business

The Court finds that the corporations operate as a single unit in all aspects of the relevant business, favoring a finding of control. This case concerns a putative class action concerning certain chairs made by (or for) Singapore SG and sold/distributed in the U.S. As detailed below, the Court finds the following factors relevant to this finding: (1) that major business-decision makers and decision-making process are centralized (within Secretlab SG) and are effectively the same for both companies; and (2) that Secretlab US has no employees and exclusively utilizes Secretlab SG

1    officers and employees for all work functions (other than warehousing and distribution tasks which

2    are handled by third-party contractors, who are chosen by Secretlab SG, not Secretlab US).

3    Accordingly, with regard to the relevant business, the Court finds that these two corporations operate

4    as a single unit, favoring a finding of control.

5         First, operations for both the parent company (Secretlab SG) and its subsidiary (Secretlab

6    US) are centralized in Secretlab SG's offices in Singapore, such that major operational decisions

7    and functions are managed from a single location. This centralization necessarily results in Secretlab

8    SG exerting substantial (if not virtually complete) control over the activities of Secretlab US,

9    reinforcing the notion of a single operational unit.  Significantly, the fact that Secretlab US does not

10   have any employees in the United States further supports the conclusion that the subsidiary relies

11   entirely on the parent company's resources, decision makers, and workforce. The absence of US-

12   based employees means that all functions for Secretlab US which would typically performed by

13   local employees (such as customer service, logistics, and administrative tasks) are managed by

14   Secretlab SG or outsourced under its direction.

15        Second, the operational intermingling of both entities is reinforced by the fact that the CEO

16   of Secretlab SG is also the CEO of Secretlab US; the CSO of Secretlab SG is also an officer and

17   director of Secretlab US; and the General Counsel of Secretlab SG is also the General Counsel and

18   Secretary of Secretlab US.  *Id.* at 48.  Additionally, the corporate filings for Secretlab US identify

19   its primary offices as the offices of Secretlab SG in Singapore.  *Id.* at 62, 69–70, 97.  While Secretlab

20   US is a Delaware corporation with a Delaware address, that address is merely a mail drop and not

21   the address of any operating office.  *See id.* at 12, 71–72.  Secretlab US exists admittedly merely as

22   an entity for entering into warehousing and distribution agreements in the United States, and for

23   international tax purposes.  *Id.* at 14 ("And their role, Secretlab US, is to basically do two things: to

24   enter into buy-sell transactions with consumers in the United States, and also to enter into contract

25   relationships with fulfillment service providers, who will then provide fulfillment services and a lot

26   of the warehousing services that's required to kind of send goods to whoever has ordered goods from

27   Secretlab US.").  As such, it makes sense that both Secretlab entities operate as a single entity.

28        Additionally, as discussed above, the computer systems for Secretlab US and Secretlab SG

United States District Court
Northern District of California

16

are not merely integrated, they are one and the same for both entities.  *Id.* at 32, 46, 76–77, 79, 101–102.  Further, both entities use a centralized website domain, "secretlab.co," purchased for and used by the entire Secretlab group of companies worldwide, and that domain is under Secretlab SG's control.  *Id.* at 14–15, 61–62, 64, 78–79.  Further, there is no US designated email address; every employee e-mail address uses the domain "secretlab.sg."  *Id.* at 78–79.  The use of a common, singular domain name is particularly relevant to the business here, because Secretlab sells, markets, and causes the delivery and distribution of its products through the use of its online store or Internet portal.  The centralized computer system, cloud-based document repository shared by the entities, and common domain name under Secretlab SG's control all indicate that the business is operated as a single unit thus favoring a finding of control.

Secretlab argues that other factors that cut against the finding that Secretlab SG and Secretlab US operate as a single unit.  As noted, Secretlab SG and Secretlab US are maintained as separate entities to adhere to different tax structures, because the companies deem it crucial to ensure that the Secretlab entities are not overtaxed or double taxed for the same transaction in multiple jurisdictions.  [Dkt. 69 at 19–22, 28–29, 32, 34, 37, 101].  While separation for tax purposes indicates some attempt to keep the entities financially distinct, the tax structure between the two companies is not a particularly relevant part of the business for purposes of this case.  This is not a case involving a dispute over tax refunds, tax credits for international tax payments, or tax fraud.  Thus, this factor is not relevant to the issue of control for purposes of discovery of the documents relevant to this case.

However, the Court does find that certain facts lead to an opposite finding.  Specifically, the corporations': (1) separate tax structures; (2) the distribution agreement; and (3) website automation.  This separation undermines the argument that they function entirely as a single unit in all aspects of their business.

Second, the fact that that Secretlab US operates primarily as a distribution entity for goods produced by Secretlab SG, with sales transactions automatically facilitated through Shopify, does not alter the conclusion here.  *Id.* at 14, 16, 80.  With regard to consumer sales, third-party contractor Shopify handles the automated transaction process which is run through the Secretlab website (and,

as discussed, that website is controlled by Secretlab SG).  The fact that a third-party is the entity that is processing the sales transactions does not indicate that Secretlab US is operating separately from Secretlab SG.  This is because Secretlab US plays virtually no operational role in processing those sales.  In other words, the fact that the third-party vendor handles these functions puts both Secretlab US and Secretlab SG in the same position vis-à-vis the third-party vendor in the sense that both entities benefit from the services of this same vendor.

The fact that Secretlab US enters into agreements with warehousing and distribution service providers in the U.S., as opposed to Secretlab SG, indicates some level of separation of functions. However, as with Shopify above, the fact that Secretlab US's only role is to enter into these agreements with delivery and warehousing providers (while Secretlab US does not, itself, undertake any of those operational functions) does not elevate Secretlab US into an entity operating independently from Secretlab SG.  As discussed above, Secretlab SG chooses and instructs Secretlab US as to which fulfillment vendors to engage.  *Id.* at 14.  And vis-à-vis the services of those warehousing/deliver vendors, both Secretlab entities benefit from the services.  As with Shopify, because Secretlab US plays no functional role in handling distribution and consumer transactions within the United States, the fact that Secretlab SG is also similarly not involved in those functions does not indicate that the two corporations are operating in compartmentalized or distinct spheres of operational structure.  Rather, because neither is directly involved in these functions, they stand in the same shoes as customers or recipients of the benefits of the services of the vendors, and in that sense are more akin to a singular unit.

Accordingly, balancing the evidence and the record provided, the Court finds that Secretlab US and Secretlab SG operate as a single unit.  This factor weighs strongly in favor of a finding of "control" for purposes of discovery.

### 3. Whether the corporations have identical stockholders and directors

The two corporations have identical directors which favors a finding of control.  Mr. Ang is a director and CEO for both Secretlab US and Secretlab SG.  [Dkt. 69 at 11–12, 48, 50].  Further, Mr. Choo is also a director and Chief Strategy Officer of both Secretlab US and Secretlab SG.  *Id*. at 11–12, 48, 50.  Additionally, Ms. Tantono herself is the General Counsel and Corporate Secretary

United States District Court
Northern District of California

for all Secretlab entities worldwide (including the two at issue here), *id*. at 5, 6, 11–12, 39, 67.

Finally, Secretlab US is a wholly owned subsidiary of Secretlab SG and thus the two entities have identical stockholders because the shareholders of Secretlab SG are necessarily the owners of Secretlab US.  [Dkt. 39 at 4].

The fact that Secretlab US and Secretlab SG share management, directors, and shareholding all illustrate why there exists the kind of significant alignment in their operations and leadership structure discussed above.  This factor weighs strongly in favor of a finding of "control" for purposes of discovery.

### 4.  Whether the subsidiary acted as the agent of the parent in the relevant transaction

As discussed, this is a putative class action in which Plaintiff alleges that Secretlab advertised on and then sold through its website certain of Secretlab's gaming chairs while falsely or misleadingly advertising that the prices were purportedly discounted from original, higher prices. [Dkt. 1 at ¶ 1].  Plaintiff alleges that the gaming chairs were never sold at the purported original price (or were offered at this higher price for an "inconsequential" period of time), and thus the alleged "discounted" prices on the Secretlab website are illegal marketing tactics.  *Id.*  Thus, the relevant transactions here involve the marketing and sale of the identified Secretlab gaming chairs to consumers in the United States at the stated prices.

As detailed above, Secretlab US relies on Shopify for processing the sales transactions for U.S. customers who purchase through the Secretlab website.  And Secretlab US as the authorized distributor of Secretlab's products functionally relies on fulfillment vendors to handle physical storage and deliver of the gaming chairs to consumers.  As discussed above, Secretlab US's management (officers and General Counsel) are all Secretlab SG officers.  As summarized above, operations, decision-making, and computerized systems are all centralized within Secretlab SG in Singapore.  Secretlab SG identifies fulfillment vendors and instructs Secretlab US on which of such vendors to engage for services.

The Court finds that Secretlab US is the agent (for purposes of this discovery issue) of Secretlab SG with regard to the relevant transactions here, that is the sale and distribution of the

1   Secretlab gaming chairs at certain prices.  This factor favors a finding of "control" for purposes of

2   discovery of the documents at issue here.

3   ### 5.   Whether the subsidiary can secure documents from the parent to meet its own business needs

4   For the reasons discussed above with regard to Secretlab US's actual possession of Secretlab

5   SG documents, the facts strongly support the conclusion that the subsidiary, Secretlab US, can

6   secure documents from the parent, Secretlab SG, to meet its own business needs.  Secretlab US and

7   Secretlab SG files are held in a common centralized repository, where documents belonging to both

8   entities are electronically stored in a cloud-based system together.  [Dkt. 69 at 32, 46, 76–77, 79,

9   101–102].  This centralized storage system ensures that all relevant documents are easily accessible

10  by anyone logging into the system without any firewalls, credential differences, or security systems

11  preventing a Secretlab US person accessing the documents of Secretlab SG.  *Id*. at 31, 46.  Should

12  Secretlab US need a document from Secretlab SG, its parent, the documents can be readily and

13  easily obtained from the centralized, shared electronic repository.  *Id*.

14  All Secretlab SG employees have technical access to this centralized repository, which

15  means they can access files from both Secretlab US and Secretlab SG without additional steps of

16  verification.  *Id*.  And again it bears repeating that there are no Secretlab US employees, and thus

17  the only "Secretlab US" personnel are officers and directors of both Secretlab SG and Secretlab US.

18  Thus, because Secretlab US personnel are also, simultaneously, Secretlab SG personnel, the

19  computerized electronic system is always accessible by Secretlab US.  This seamless access is

20  facilitated by the digitalization of all Secretlab records, which are hosted on the cloud.  *Id*. at 31.

21  There is no distinction in the process of accessing files for Secretlab US or Secretlab SG, indicating

22  a unified system for document retrieval.  *Id*. at 46.

23  Further, the record demonstrates specific instances where Secretlab US has been able to

24  access needed documents from Secretlab SG for Secretlab US's own needs.  For example, Tantono

25  was able to access historic Terms of Service stored by the Secretlab SG information technology

26  team in order to support Secretlab US's Motion to Dismiss.  *Id.* at 64–66.  Per Tantono's testimony,

27  such "declarations" were made by Tantono "on behalf of Secretlab US[,]" and as a "Secretlab US

28

United States District Court
Northern District of California

1 representative." *Id*. at 66.

2     Secretlab argued that Secretlab SG employees do not have "authorization" to access all

3 documents on the system, *id*. at 31–32, 44–47, 101–102, and that Secretlab SG is not "authorized"

4 to give data to Secretlab US unless the data is being held on Secretlab US's behalf.  [Dkt. 69 at 30–

5 31].  Secretlab provided no information on what this "authorization" consists of or how it restricts

6 actual access to the documents – as noted, there is no technological limitation on access, no

7 documents were provided which explain what this means, and the witness identified no operational

8 or actual procedures or impediments to obtaining documents based on this "authorization".  At best,

9 this asserted "authorization" appears to be merely conceptual (and thus objectively not functional in

10 any ascertainable way; at worst, this reliance on "authorization" appears to be self-serving verbiage

11 designed to obfuscate the reality that the computerized repository is freely available to all Secretlab

12 personnel worldwide.  Fundamentally, there is nothing in the record demonstrating that Secretlab

13 US lacks the ability to secure documents from Secretlab SG when needed. The unified repository

14 and equal access for employees support the ability of Secretlab US to obtain necessary documents

15 from its parent company to fulfill its business requirements.

16     **6.  Whether the subsidiary has some ownership interest in the parent**

17     Here, Secretlab US does not own Secretlab SG, but rather is itself wholly owned by Secretlab

18 SG.  However, the Court does not blind itself to the fact that Secretlab US's CEO, CSO, and General

19 Counsel are all in the same positions with regard to Secretlab SG.  And those officers and directors

20 of Secretlab US further own shares in Secretlab SG.  Given the specific facts here, it might be

21 theoretically possible under a piercing of the corporate veil approach to consider whether the

22 ownership of shares of Secretlab SG by these Secretlab US officers and directors could be imputed

23 to Secretlab US itself.  However, plaintiff Nugent has not submitted evidence to support such an

24 inquiry.  As such, the Court does not consider this factor in its determination.

25     **7.  Whether other case specific factual inquiries exist to show control**

26
27     In evaluating the "control" issue under Rule 34, courts conduct a "factual and case specific"

28 inquiry.  *Tessera*, 2006 WL 733498, at *4.  The Court has discussed a number of case-specific

factors above.  As an initial matter, the fact that Secretlab US is a wholly-owned subsidiary of Secretlab SG does not, by itself, negate a conclusion of "control" for purposes of discovery under Rule 34.  A finding of "control" (or a legal right to access upon demand) for purposes of discovery is not a finding of corporate control in the sense of corporate governance law, is not a finding as to respondeat superior type liability and is not to be confused with purely business operational control. *See e.g.*, *In re Soc. Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig.*, No. 22-MD-03047-YGR (PHK), 2024 WL 4125618, at *9 (N.D. Cal. Sept. 6, 2024); *In re ATM Fee Antitrust Litig.*, 233 F.R.D. 542, 545 (N.D. Cal. 2005); *LG Display Co. v. Chi Mei Optroelectronics Corp.*, No. 08CV2408-L(POR), 2009 WL 223585, at *3 (S.D. Cal. Jan. 28, 2009).  Thus, "courts have determined that a subsidiary controls documents in possession of the parent company when counsel for the subsidiary has admitted access to documents in possession of the parent company or when the subsidiary can obtain documents in possession of the parent company in the ordinary course of business." *Id.* (citing *Hunter Douglas, Inc v. Comfotex Corp.*, No. M8-85 (WHP), 1999 U.S. Dist. LEXIS 101 (S.D.N.Y. Jan. 11, 1999); *Camden Iron & Metal, Inc. v. Marubeni America Corp.*, 138 F.R.D. 438 (D.N.J. 1991)).

Additional specific factors that indicate Secretlab US has the legal right to obtain documents on demand from Secretlab SG.  With regard to Secretlab's in-house legal department, Secretlab US and Secretlab SG share the same legal team (based in Singapore), consistent with the overall centralized approach of Secretlab's internal organization worldwide.  [Dkt. 69 at 39–40, 42–43, 47, 69, 79].  This shared legal team represents all entities within the Secretlab group worldwide, handling the legal needs for both the parent and subsidiary.  *Id.* at 39.  For instance, "when Secretlab US has a requirement for contracts to be developed, it would be sent over and managed by the centralized legal team that [the General Counsel Tantono] manage[s]" where both Secretlab US and Secretlab SG maintain a copy of such contract.  *Id.* at 42–43.  Secretlab thus implements a centralized and consistent approach to legal matters for its worldwide business (much like its approach to other operational aspects of the business as conducted by the Singapore and US entities, and much like the overlapping/interlocking management on the business side of operations).  This factor, viewed in the context of the totality of other factors, also favors a finding of control for

United States District Court
Northern District of California

United States District Court
Northern District of California

purposes of discovery.

Secretlab argues that the Distribution Agreement supports finding no "control" because, under that agreement, Defendant and Secretlab SG are distinct entities with defined separate roles: Secretlab SG determines the advertising and pricing strategies, while Defendant merely controls the distribution of the products.  [Dkt. 39 at 4].  Under the Distribution Agreement, Secretlab US has no express contractual right to demand advertising and pricing information from Secretlab SG.  That agreement grants Secretlab US the contractual right to demand information with respect to the expenses incurred by Secretlab SG in marketing the products, which Secretlab US argues is irrelevant to Plaintiff's discovery requests.  *Id.*  While Secretlab US is correct that the terms of the Distribution Agreement are framed in these terms, that Distribution Agreement did not result in any changes to the freely and openly accessible documents in the shared computerized document repository.  Nor did Secretlab US provide evidence on how (or even whether at any time) the corporate entities relied upon any language in the Distribution Agreement to actually impact how documents are accessed.  As with the "authorization" argument above, at best the terms of the Distribution Agreement are an expression of intention without any operative or actionable facts, or at worst the agreement is a self-serving attempt to avoid an examination of the Secretlab shared document repository based firmly in reality.

Plaintiff Nugent argues that Secretlab US has, in fact, exercised access and control because "on October 31, 2023, Defendant produced SECRETLAB000001-3, which are internal Secretlab SG documents."  *Id.*  In opposition, Secretlab US argues that "Plaintiff merely speculates that Defendant has the practical ability to obtain a limited range of documents from Secretlab SG, which is wholly insufficient to establish control."  *Id.* at 4–5.  Secretlab US further argues that "Defendant does not have specific access to pricing and advertising information held by Secretlab SG.  And that 'Secretlab SG keeps' records of its online transactions (as Plaintiff highlights) doesn't change that.  All that matters is that Defendant does not have specific access to the documents Plaintiff seeks." *Id.* at 5.

First, it is unclear what "specific access to the documents" refers to – the Ninth Circuit standard for "control" under Rule 34 does not use that phrase.  *Citric Acid*, 191 F.3d at 1107

23

("[c]ontrol is defined as the legal right to obtain documents on demand.").     Second, Secretlab's argument about "practical ability" to obtain documents is legally irrelevant because the Ninth Circuit rejected "practical ability" as a factor for determining "control".  *See Genentech, Inc. v. Trustees of the Univ. of Penn.*, 2011 WL 5374759, at *2 (N.D. Cal. Nov. 7, 2011) (distinguishing "practical ability" case law); *see also In re NCAA Student-Athlete Name & Likeness Litig.*, No. 09-CV-01967 CW NC, 2012 WL 161240, at *4 (N.D. Cal. Jan. 17, 2012)*.  Further, Nugent has not speculated as to an "ability" to obtain documents – rather, Nugent has presented evidence that Secretlab US has actually obtained and has actually possessed (and thus produced) documents from Secretlab SG.

Plaintiff Nugent cites *Choice-Intersil* to support the argument that Secretlab US has control over the Secretlab SG's documents because Secretlab US "can obtain documents in possession of the parent company in the ordinary course of business."  Dkt. 39 at 3.  As discussed above, that facts here are indeed analogous to the situation in *Choice-Intersil*.  *Choice-Intersil,* 224 F.R.D. at 473.  In *Choice-Intersil*, the Court found that the subsidiary had "access and control over documents by [the parent]" because of the following factors: (1) the subsidiary is wholly-owned by their parent; "(2) were it not for changes in market conditions, [the subsidiary] would have marketed this product in North America; (3) [the subsidiary and the parent company] share databases dealing with a variety of documents did records; and (4) upon demand, [the subsidiary] was able to obtain high-level documents from [the parent company] related to the marketing of the chip." *Id*. at 472–73.  Notably, in *Choice-Intersil* the wholly owned subsidiary had access to its parent's documents because they shared relevant databases and, significantly, the subsidiary could obtain high-level documents from its parent "upon demand." *Id*.

The Court recognizes that *Choice-Intersil* relies on *Camden Iron & Metal v. Marubeni America*, 138 F.R.D. 438 (D.N.J. 1991), which arose in the Third Circuit which applies "practical ability" as one factor for control rejected by the Ninth Circuit.  *See Cryptography Rsch., Inc.*, 2005 WL 8162416, at *2 (declining to follow the *Choice-Intersil Microsystems* Court on those ground); *see Matthew Enter., Inc. v. Chrysler Grp. LLC*, 2015 WL 8482256, *3 (N.D. Cal. 2015) ("Like the majority of circuits, the Ninth Circuit has explicitly rejected an invitation to define 'control' in a manner that focuses on the party's practical ability to obtain the requested documents."); *see also*

*Micron Tech., Inc.*, 2006 WL 1646133, at *2  (holding that despite being a wholly-owned subsidiary, plaintiff failed to present evidence "of any contract between the two companies" or a "mechanism [ ] to compel [the third-party] to produce those documents.").  However, the *Choice-Intersil* opinion never refers to the "practical ability" test used in other Circuits and thus that opinion's reliance on and citation to *Camden Iron & Metal* does not mean that *Choice-Intersil* was relying on "practical ability" to reach its conclusion, particularly where *Camden Iron & Metal* relied on a number of factors to find control and (in turn) never expressly relies on or uses the phrase "practical ability." *See Camden Iron & Metal, Inc. v. Marubeni Am. Corp.*, 138 F.R.D. 438, 442-43 (D. N.J. 1991).

The facts of this case are more analogous to *PlayUp, Inc. v. Mintas* in which the Nevada District Court used the Ninth Circuit's legal "control" standard for discovery.  In *PlayUp*, the court held that Defendant Mintas sufficiently established that Defendant Simic (CEO of third-party PlayUp Ltd.) has legal control over the documents of that third-party:

> Mintas has made a sufficient showing that Simic has control over PlayUp Ltd.'s documents.  Simic is the CEO of PlayUp Ltd.  Such a fact, standing alone, might suffice to establish control for Rule 34 purposes.  In addition, however, Simic also testified that he has access to and controls all of PlayUp Ltd.'s corporate records on its Microsoft Teams database, that he is in charge of this litigation for PlayUp, and that he printed the emails related to the case and provided them to PlayUp's lawyers.

*PlayUp, Inc*, 2024 WL 3621449, at *5 (internal citations omitted).

Here, as in *PlayUp* where the named party Simic had access to the computerized database of the third-party, Secretlab US has access to the same corporate records on the computerized database used by Secretlab SG.  Here, as in *PlayUp* where the named party obtained documents earlier in the case from the third-party, Secretlab US obtained and produced in discovery internal documents from Secretlab SG and produced them.  And here, as in *PlayUp* where the named defendant is in charge of the litigation, the General Counsel of Secretlab SG (who is simultaneously the General Counsel of Secretlab US) is in charge of the litigation for Secretlab US.

As the Ninth Circuit has instructed, the determination of "[c]ontrol must be firmly placed in reality."  *Int'l Union*, 870 F.2d at 1453.  Here, the finding of "control" for purposes of discovery is firmly placed in view of the reality of how the computerized storage systems are organized for free

use at any time by both Secretlab entities, coupled with the centralized and common workforce from Secretlab SG carrying out functions (from high level decision-making to day-to-day operations) for Secretlab US. Ultimately, after considering all the facts and analyzing the factors, the Court finds that Secretlab US has legal control over Secretlab SG's documents.

## II.   WHETHER PLAINTIFFS' RETAINER AGREEMENT IS DISCOVERABLE AT THE PRE-CLASS CERTIFICATION STAGED

As explained above, "[g]enerally at the pre-class certification stage, discovery in a putative class action is limited to certification issues such as the number of class members, the existence of common questions, typicality of claims, and the representative's ability to represent the class." *Gusman v. Comcast Corp.*, 298 F.R.D. 592, 595 (S.D. Cal. 2014).  If no such issue exists, then, generally, courts deny on relevancy grounds.  *In re Google AdWords Litig.*, 2010 WL 4942516, at *4 (citing *Rodriguez v. West Publishing Corp.*, 563 F.3d 948 (9th Cir. 2009)).

the Court finds that Secretlab US has failed to produce sufficient evidence to establish a conflict of interest.  Secretlab US only points to deposition testimony where a deponent purportedly "testified that counsel failed to present him with a prefiling settlement offer made by Defendant in violation of the Rules of Professional Conduct[]" and, from this, argues that "[t]his failure raises questions as to potential conflicts or incentives in the fee structure[.]"   [Dkt. 48 at 5].  This is insufficient to establish a reasonable basis for subjecting the engagement letter to discovery, and the Court finds that this amounts to no more than the kind of mere suspicion which was rejected by precedent.  Because an engagement letter is an attorney-client communication, more than mere subjective questions in defense counsel's mind is required to justify discovery.

Further, on March 22, 2024, Plaintiff Nugent indicated that it would produce the retainer agreement for an *in camera* review.  *See* Dkt. 48; 50.  After a thorough review of the retainer agreement, the Court finds there to be no incentive agreement within the retainer agreement. Because there is no incentive agreement within the retainer agreement, the Court finds there is no basis for the speculation about "questions" concerning allegedly potential conflicts of interest. Accordingly, the Court finds that Defendants have failed to show why discovery of the retainer agreement is appropriate in these circumstances, and the Court **DENIES** Defendant's motion to

compel.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiff Nugent's motion to compel production of documents from parent company and third-party Secretlab SG Pte. Ltd. in response to Requests for Production of Documents served on Defendant Secretlab US.  Secretlab US has actual possession and custody of the documents of Secretlab SG.  Additionally, Secretlab US has "control" for purposes of discovery of the documents of Secretlab SG.  The Parties are **ORDERED** to promptly meet and confer to (1) identify the specific Requests for Production which Plaintiff contends are impacted by this ruling, (2) resolve any other outstanding disputes or objections as to those RFPs, and (3) reach agreement on a reasonable schedule for the production of non-privileged documents responsive to these requests.  By October 25, 2024, the Parties shall file a Status Report as to the production of Secretlab SG's documents and the results of the meet and confer.

The Court further **DENIES** Secretlab US's motion to compel production of Plaintiff Nugent's retainer agreement with counsel.

**IT IS SO ORDERED.**

Dated:  September 27, 2024

PETER H. KANG
United States Magistrate Judge